Jeffrey L. Hartman, Esq.
Nevada Bar No. 1607
**HARTMAN & HARTMAN**
510 W. Plumb Lane, Suite B
Reno, NV 89509
T: (775) 324-2800
F: (775) 324-1818
notices@bankruptcyreno.com

Michael S. Budwick, Esq. #938777 – Admitted *Pro Hac Vice*
Solomon B. Genet, Esq. #617911 – Admitted *Pro Hac Vice*
Gil Ben-Ezra, Esq. #118089 – Admitted *Pro Hac Vice*
**MELAND BUDWICK, P.A.**
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131
T: (305) 358-6363
F: (305) 358-1221
mbudwick@melandbudwick.com
sgenet@melandbudwick.com
gbenezra@melandbudwick.com

Attorneys for Christina Lovato, Chapter 7 Trustee

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| In re<br><br>DOUBLE JUMP, INC.<br><br>Debtor.<br><br>Affects:<br>☒ DC Solar Solutions, Inc.<br>☒ DC Solar Distribution, Inc.<br>☒ DC Solar Freedom, Inc.<br>☒ Double Jump, Inc.<br><br>CHRISTINA W. LOVATO,<br><br>Plaintiff,<br><br>v.<br><br>MANDALAY BAY, LLC, dba<br>MANDALAY BAY RESORT & CASINO,<br><br>Defendant. | Lead Case No.: BK-19-50102-gs<br>(Chapter 7)<br><br>Jointly Administered with:<br><br>\| 19-50130-gs \| DC Solar Solutions, Inc. \|<br>\| 19-50131-gs \| DC Solar Distribution, Inc. \|<br>\| 19-50135-gs \| DC Solar Freedom, Inc. \|<br><br>Adversary No.: 19-05032-gs<br><br>**AMENDED COMPLAINT** |
|---|---|

Christina Lovato, in her capacity as the chapter 7 trustee ("**Trustee**" or "**Plaintiff**") for the bankruptcy estates of DC Solar Solutions, Inc. ("**DCSS**"), DC Solar Distribution, Inc. ("**DCSD**"),

{02479993.DOCX.}1

DC Solar Freedom, Inc. ("**DCSF**") and Double Jump, Inc. ("**DJ**," and together with DCSS, DCSD and DCSF, the "**Debtors**"), files her amended complaint ("**Complaint**") in this adversary proceeding ("**Action**") against Mandalay Bay, LLC ("**Defendant**"). In support, the Trustee alleges as follows:

## PARTIES

1. The Trustee is the chapter 7 bankruptcy trustee for the Debtors. The Trustee has the capacity to commence this action by way of, among other things, 11 U.S.C. § 323.

2. The Defendant is a limited liability company organized under the laws of the State of Nevada with its principal place of business in Las Vegas.

## JURISDICTION

3. The Bankruptcy Court has jurisdiction over this case and this adversary proceeding under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (H) and (O). Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

4. The Trustee consents to the entry of final orders and judgments by the Bankruptcy Court.

## FACTUAL ALLEGATIONS

**I.    DC Solar and the Carpoff Ponzi Scheme**

5. DC Solar was incorporated and headquartered in California.

6. DC Solar had, at all material times, certain legitimate business operations.

7. From no later than on or around calendar year(s) 2010 through 2018, DCSS, DCSD and DCSF (together, "**DC Solar**") was engaged in a business related to manufacturing, marketing, selling and leasing mobile solar generators ("**MSGs**").

8. Generally, the business purported to operate as follows. DCSS would manufacture and sell MSGs for $150,000 each. The buyers were typically tax-equity funds, 95% owned by a financial investor seeking investment federal tax credits. The buyers would provide DCSS a $45,000 down-payment (30% of the total purchase price) and execute a promissory note for the remaining balance. The buyers would lease the MSGs to DCSS's affiliate DCSD, which in turn

purported to sub-lease the MSG to an end-user/sub-lessee. The end-user's/sub-lessee's lease payments were intended to cover the interest payments on the promissory note.

9. DCSF's role was in connection with marketing, branding and advertising the MSGs and DC Solar, in connection with the socially-conscious nature of solar energy.

10. DC Solar had significant professional, operational and other expenses.

11. The financial investor that acquired the majority stake in the buyer sought to take advantage of valuable federal income tax benefits related to the purchase, use and depreciation of the MSGs.

12. Over the years, DCSS closed over two dozen transactions, purportedly selling over 15,000 MSGs and generating hundreds of millions of dollars of revenue.

13. However, certain DC Solar's insiders, including Jeff Carpoff and Paulette Carpoff ("**Carpoffs**"), were also perpetrating a Ponzi scheme ("**Carpoff Ponzi Scheme**") through the instrumentalities of DC Solar and other entities.

14. The Carpoffs caused DC Solar to transfer monies obtained from new buyers of MSGs to cover obligations owed by earlier buyers. This was contrary to the Carpoffs' representations (directly or indirectly) to the financial investors that sub-lessee revenue would pay those obligations. And while the Carpoffs (directly and indirectly) communicated to the financial investors that DC Solar had manufactured over 15,000 MSGs, the actual figure was far less. Moreover, although the Carpoffs (directly or indirectly) represented to the financial investors that DC Solar had a series of sub-lessees willing to pay to utilize the MSGs, some sub-leases were real but others were not.

15. Further, the Carpoffs looted DC Solar to, among other things, fund their own lavish lifestyle, including through casino gambling and the use of private jets and the purchase of real and personal property (such as automobiles). And the Carpoffs looted DC Solar to, among other things, pay-off co-conspirators and make payments such as marketing payments (legitimate or illegitimate) to third-parties. This all was intended, in material part, to further the Carpoff Ponzi Scheme and/or create the perception that DC Solar was profitable.

16. Because of (among other things) the harm the Carpoffs inflicted upon DC Solar through the Carpoffs' wrongdoing, including the liabilities the Carpoffs created for DC Solar, DC Solar was insolvent on the date of the Transfer (defined below).

17. Aside from the Carpoffs, some of DC Solar's other insiders knew of and participated in the Carpoff Ponzi Scheme. However, certain other DC Solar-insiders, including certain individuals who owned equity interests, and certain individuals who served as officers, and certain individuals who were executives, and certain individuals that held (or also held) management-level positions at different times and each with varying levels of authority, over one or more of the Debtors, did not know of the Carpoff Ponzi Scheme.

## II. The Raid Through the Debtors' Bankruptcy Filing

18. On December 18, 2018, Federal law enforcement raided the business locations of DCSS, DCSD and certain other affiliates ("**Raid**").

19. After December 18, 2018 and before the Petition Date (defined below), DC Solar made substantial corporate governance changes, and retained GlassRatner Advisory & Capital Group LLC and designated Seth R. Freeman as chief restructuring officer.

20. On February 3, 2019 ("**Petition Date**"), DCSS filed its voluntary chapter 11 petition in the Bankruptcy Court, and around the same time, the other Debtors filed voluntary chapter 11 petitions as well. The Debtors' chapter 11 bankruptcy cases were converted to chapter 7 on March 22, 2019 and the Trustee was appointed as the chapter 7 trustee.

## III. The Transfer

21. Mr. Carpoff frequently gambled, including at the casino operated by the Defendant.

22. Upon information and belief, Mr. Carpoff's customer account number with the Defendant was 9284304.

23. Upon information and belief, at some point prior to September 10, 2018, Mr. Carpoff executed markers in favor of Defendant in an amount not less than $500,000.

24. These markers evidenced a personal debt of Mr. Carpoff. Neither DCSS nor any other of the Debtors was legally obligated to pay this debt. No corporate assets of DCSS or any of the Debtors were used to secure payment of this debt.

{02479993.DOCX.}4

25. On or about September 10, 2018, Mr. Carpoff caused DCSS to transfer $500,000 to the Defendant ("**Transfer**").

26. The Transfer was made in furtherance of and was related to the Carpoff Ponzi Scheme. Among other things, Mr. Carpoff looted DCSS by causing it to make the Transfer to satisfy his personal debt. The money came from DCSS and was sourced in large part from defrauded investors. The Transfer removed monies from DCSS which could have otherwise been used to pay DCSS' liabilities to its creditors. The Transfer rendered DCSS further insolvent. And one of the Carpoffs' goals in perpetrating the Carpoff Ponzi Scheme was to loot the companies to fund their lifestyle, including casino gambling.

27. Prior to filing her initial complaint, the Trustee made demand upon the Defendant for repayment of the $500,000. The Defendant ignored the Trustee's demand.

## CLAIMS FOR RELIEF

### COUNT I
**Actual Fraudulent Transfer**
**11 U.S.C. § 548(a)(1)(A)**

28. The Trustee re-alleges paragraphs 1 through 27 as though fully stated herein.

29. DCSS made the Transfer within two years of the Petition Date.

30. DCSS made the Transfer with the actual intent to hinder, delay or defraud its creditors.

31. Mr. Carpoff caused the DCSS to make the Transfer in furtherance of the Carpoff Ponzi Scheme as part of his looting of the Debtors.

32. DCSS was insolvent by no later than the time of the Transfer.

33. DCSS received no benefit in exchange for the Transfer.

### COUNT II
**Constructive Fraudulent Transfer**
**11 U.S.C. §§ 548(a)(1)(B)**

34. The Trustee re-alleges paragraphs 1 through 27 as though fully stated herein.

{02479993.DOCX.}5

35. DCSS made the Transfer within two years of the Petition Date.

36. By no later than the time of the Transfer, the Carpoffs were perpetrating the Carpoff Ponzi Scheme through DC Solar and other entities. At the time of the Transfer, because of the Carpoff Ponzi Scheme and the claims (sounding in contract and tort) of the buyers of MSGs against DCSS, DCSS: (i) was insolvent, as its liabilities exceeded its assets; (ii) was engaged (and was continuing to engage) in a business or transaction for which DCSS' property remaining after the Transfer constituted unreasonably small capital; and (3) intended to incur, or believed that it would incur, debts beyond its ability to pay.

37. DCSS received no benefit in exchange for the Transfer.

## COUNT III
## 11 U.S.C. § 550(a)

38. The Trustee re-alleges paragraphs 1 through 37 as though fully stated herein.

39. The Trustee is entitled to avoid the Transfer pursuant to 11 U.S.C. §548. *See* Counts I and II above.

40. The Defendant is the initial transferee of the Transfer. Therefore, once avoided, the Trustee may recover the Transfer from the Defendant.

**WHEREFORE**, the Trustee prays for and demands order and judgment against the Defendant as follows:

(1) Count I:   Avoiding the Transfer under 11 U.S.C. §548(a)(1)(A).

(2) Count II:  Avoiding the Transfer under 11 U.S.C. §548(a)(1)(B).

(3) Count III: Entering a Judgment in the amount of the Transfer ($500,000) in favor of the Trustee and against the Defendant along with interest both before and after the commencement of this Action.

In addition, the Trustee requests from the Court any such other and further relief, equitable or otherwise, that this Court deems just and proper.

DATED: September 4, 2020.

**HARTMAN & HARTMAN**

*/s/ Jeffrey L. Hartman, Esq.*
Jeffrey L. Hartman, Esq., Attorney for Plaintiff Christina Lovato

**MELAND BUDWICK, P.A.**

*/s/ Michael S. Budwick, Esq.*
Michael S. Budwick, Esq., Admitted Pro Hac Vice
*/s/ Solomon B. Genet, Esq.*
Solomon B. Genet, Esq., Admitted Pro Hac Vice
*/s/ Gil Ben-Ezra, Esq.*
Gil Ben-Ezra, Esq., Admitted Pro Hac Vice
Special Counsel for Plaintiff

{02479993.DOCX.}7